Filed 7/8/15  In re Kyler G. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re KYLER G. et al., Persons Coming Under the Juvenile Court Law. | |
| | D067356 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3155A-C) |
| v. | |
| KRISTA K., | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Krista K. appeals from orders entered at a jurisdiction and disposition hearing declaring her minor children, Kyler G., L.L., and P.K. (together, the children), dependents of the juvenile court under Welfare and Institutions Code section 300[1] and removing them from parental custody. Krista's sole contention on appeal is that the evidence was insufficient to support the disposition orders[2] (judgments) removing the children from her care. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2014, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of seven-year-old Kyler under section 300, subdivision (b), and petitions on behalf of four-year-old L.L. and two-year-old P.K. under section 300 subdivision (j) alleging that Krista's boyfriend, Robert S. (Rob), subjected Kyler to physical abuse and harm by placing a dog collar around Kyler's neck and choking him with it. Kyler reported that Rob also hurt him in other ways and that Krista was aware of the abuse but had failed to intervene and protect him.

Kyler has been legally blind since birth and is diagnosed with optic nerve hypoplasia and growth hormone deficiency. Optic nerve hypoplasia can result in acute adrenal crisis, which can be a life-threatening state caused by insufficient levels of the hormone cortisol. Physical stress or trauma is a risk factor for adrenal crisis.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     In a dependency case, the disposition order is the first appealable order and constitutes the judgment in the case. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

Kyler went to school on Monday, May 12, 2014, with scratches on his face and neck, complaining that they hurt. He reported that on the previous Saturday he had been dangling a dog collar in front of his face.[3] Rob grabbed the collar from Kyler and said, "I'm gonna bust this thing over your [fucking] . . . head." Rob then put the collar around Kyler's neck and choked him. Kyler was crying and afraid. Kyler's teacher's aide reported that when Kyler arrived at school on Tuesday, May 13, he said that his mother and Rob had been angry and yelling and his mother was "afraid of another case opening." Kyler told the aide that Rob blew cologne and bug spray in his face and that it "hurts my eyes and doesn't smell good." Krista had told Kyler not to tell anyone about anything bad that happens at home.

Kyler told an Agency social worker that Rob committed other acts that hurt him, including flipping him, dropping him from his legs onto his back and head, hog-tying him, knocking him over while he (Kyler) was sitting in a chair, putting him in chokeholds, punching him, and performing wrestling and karate moves on him. Rob once threw a piece of fruit at Kyler's head. On another occasion, Rob put a clothespin on Kyler's penis while Kyler was in the bathtub. Kyler told Krista about the clothespin incident but she said nothing. Kyler said that whenever he tells his mother about anything Rob does, she tells him not to talk about it. He wished his mom "would help me tell Rob to stop[,]" but she told him, "Baby, he's not trying to hurt you, he trying to

---

3    Kyler frequently engaged in "stemming" behaviors for self-stimulation, including dangling objects in front of him and shaking them. He referred to the behavior "dangling" and told a social worker that "dangling makes [him] happy."

toughen you up." Kyler told the social worker that Rob also did karate on his brother and sister.

Kyler also told the social worker that Rob frequently destroyed things in the house. Kyler tipped over a chair to demonstrate how Rob destroyed things. He added that when Rob got mad at Krista, he would say that he was "gonna snatch one of us out of our beds." Kyler stated, "It sounds like Rob hates mom but really he loves her." At one point Kyler told the social worker that he was not allowed to answer any questions. He later said, "Can I tell you a secret? Mom told me to say that Rob doesn't live with us anymore."

In a later forensic interview at Chadwick Center for Children & Families (Chadwick), Kyler said he screamed and cried when Rob did karate on him and Rob's response was "the more you cry, the harder I do it." Kyler also said that Rob did swimming lessons where he "dunks me under the water and chlorine and pool water gets in my tummy." He heard Rob tell Krista, "I hate you so much, I'm gonna kill your son dead." Kyler said, "I don't want to be dead." Kyler told the interviewer that Krista got mad at him for "opening a court case," and that it was good he was at his grandmother's house "so mom can't get mad." He said that Rob and Krista told him "if you say Rob did this or mom did this, they're taking you away to a place and it's not gonna be good."

The social worker interviewed L.L. at his preschool. L.L. referred to Rob as "dad," although Rob is not his biological father. L.L. said, "[Rob is] the meanest dad – he pulls my hair and spanks me. He spanks [P.K.] too, like my mom." L.L. said that Rob "karate chops" Kyler and Kyler "kind of cries," and that Rob did not like it when he told

4

Krista that Rob was being mean. In a later forensic interview at Chadwick, L.L. stated he did not like karate, but karate only hurt Kyler because Kyler was a "cry baby." When asked what kind of karate Rob did to Kyler, L.L. said, "The hard kind that makes him cry. I see him cry every night – I'm not supposed to talk [about] this." When asked whether Rob did anything to make him cry, L.L. said, "Not supposed to talk about spanking . . . because Rob will be mad." L.L. then said that Rob spanked him on the butt with a spoon, spanked Kyler's face with his hand, and spanked P.K. "when she poops in her pants."

The Agency's detention report summarized three previous dependency cases involving Kyler and L.L. In October 2009, Kyler and L.L. were removed from Krista when police conducted a drug enforcement raid at the residence of Krista and L.L.'s father. Officers found heroin and marijuana in the residence. Kyler and L.L. were detained in the maternal grandmother's home and declared dependents of the court. The court terminated jurisdiction in July 2010.

In May 2011, Kyler and L.L. were again removed from Krista's custody and placed with the maternal grandmother when law enforcement found methamphetamine and used syringes in then-four-year-old Kyler's reach. Krista had numerous bruises on her arms, legs, and neck and claimed that her boyfriend had held her hostage for four days and injected her with methamphetamine while she slept. Krista reunified with Kyler and L.L. and the court terminated dependency jurisdiction in July 2012.

In July 2013, the Agency received a referral that Krista may be using heroin again. The Agency's ensuing investigation revealed that Kyler was long overdue for an

5

endocrinology appointment and likely needed his medication adjusted. Kyler was placed with the maternal grandmother and returned to Krista's custody in October 2013. The court terminated jurisdiction on May 1, 2014, less than two weeks before the events resulting in the present case occurred.

In the present case, Krista was not cooperating with the Agency when it was preparing its detention report. She told a social worker, "I'm not the one who put the collar on him. I took it off. You guys are acting, like, insane; it was totally an accident. I'm not in the mood to start another case with you." The social worker asked Krista if she would take Kyler to Chadwick to have his injuries examined. Krista refused. She said that none of Kyler's allegations were true and that the marks on Kyler's neck were from a seat belt when she "braked hard."

At the children's detention hearings,[4] the juvenile court found that a prima facie showing had been made on the children's petitions. The court detained the children and gave the Agency discretion to place them in the approved home of a relative.[5] The court ordered supervised visitation for Krista and that there be no contact between Rob and the children.

---

[4]     The court held Kyler's detention hearing on May 15, 2014, and a detention hearing for L.L. and P.K. on May 28.

[5]     Kyler was placed with the maternal grandmother at the time of the May 28 detention hearing.

<u>Jurisdiction/disposition reports</u>

The Agency's jurisdiction/disposition report noted that Krista continued to assert that Kyler's and L.L.'s statements about Rob's abusive conduct were false. She told the social worker that Kyler had "apologized for saying what he said and that it wasn't the truth." She claimed the maternal grandmother was "behind all this," and that the grandmother had slandered her to the Agency and others and was traumatizing the children. Krista stated that Kyler's neck injury occurred when Kyler and L.L. were playing with a leash and the leash broke, and that Rob was away from her home when the incident occurred. Regarding the clothespin incident, Krista explained that she was in the bathroom when Kyler happened to be in the bathtub, and she made a joke about putting a clothespin on L.L.'s penis because he was having potty training accidents. She found an entry in her journal about L.L. playing with clothespins and suggested that he may have put one on Kyler.

The Agency provided Krista written guidelines for visitation and phone calls with the children. The guidelines provided, among other things, that Krista was not allowed to mention or speak about the dependency case or about Rob, and was not allowed to pass any communication from Rob to the children. Krista was also directed "to make no attempts to influence [the children's] statements about the way things were in the home prior to them coming into protective custody."

Krista was unable to follow the guidelines. For example, when Kyler asked Krista during a phone conversation whether she had chimes for him,[6] Krista said, "[Y]our chimes are all over here. I asked Rob to make you some chimes. Rob made you chimes that you never got because of all the things you said – I don't know why you said things that aren't true." Krista later said, "Remember I told you to tell the truth? Did Rob ever put anything on your pee pee?" Kyler answered "[N]o." Krista then asked "[A]nd did Rob ever choke you?" Kyler answered "[N]o." Krista then said, "I know those people put things in your mind and told you what to say[.] I don't get to be your mom because you said these things[,] and Rob may lose his job[,] but that's not what I called about, it was just in my head so I said it. Kyler, if you wanted to see Grammy so bad I would have taken you[.] I'm so sorry that you felt like you had to make up the story to get to Grammy." Kyler responded, "I'm so sorry mom[,] but I just don't like the wrestling." Krista then said, "Kyler, Rob just talked about it—he never even wrestled with you[,] you wrestled with ME[,] why didn't you say THAT? And you even liked wrestling with him . . . . I just don't understand why you let other people say things about . . . ."[7]

After that conversation, Kyler told his stepgrandfather that he was terrified "[b]ecause mom said that Rob was just TALKING about wrestling and he wasn't. He was trying to do [karate] on me." Kyler later said to an aunt, "Mom thinks I'm just talking about wrestling but I'm not. He's really doing [wrestling moves] on me."

_____

6      In his forensic interview, Kyler talked about his love for chimes, stating: "I can't see and this is why I love chimes so much; I can touch them."

7      The transcription of this conversation ends with the word "about."

When Kyler told Krista in another phone conversation that L.L. and P.K. were wrestling, Krista said, "[T]hat's like when Rob use [*sic*] to wrestle with you and you liked it and you would laugh." Krista added, "You need to tell [the social worker] that you like to wrestle with Rob because she thinks that you don't because of what you said." When Kyler later told Krista he wanted to read a book about telling the truth, Krista said, "I hope you read it so that you will learn to tell the truth about Rob."

During visits with the children, Krista repeatedly made negative comments about the maternal grandmother and talked about Rob. When the social worker asked Krista not to talk about the case during a visit, Krista said she could talk about whatever and continued to talk negatively about the grandmother and the court process. The social worker reported that when Krista was asked to sign a visitation agreement, she refused unless the agreement was rewritten "to include what [Krista] believes are her mother's transgressions . . . ." Krista stated it was her constitutional right to talk about Rob "or other things" during her visitation. The social worker reported that "[d]ue to [Krista's] not following the court's orders involving Rob, refusing to not discuss the case with the children, coaching the children and following the social worker [when the social worker was driving the children to the maternal grandmother's home after a visit], it was necessary to have the visits monitored by two workers[,] which limited the number[] of visits[, and] even with this added precaution [Krista] would not comply."

In an addendum report filed on August 27, 2014, the Agency social worker noted that the children enjoyed their visits with Krista. Krista brought Kyler toys and chimes and Kyler told the social worker, "I feel good because Rob isn't there . . . ." The social

9

worker asked if anything made him feel uncomfortable. Kyler stated, "[O]nly Rob is the most uncomfortable, I feel bad because of the karate and wrestling."

An addendum report filed on November 21 noted that in October, Kyler's teacher's aide reported that Kyler was afraid to go back to Krista's home "because Rob will be there and will do karate." A month later the aide reported that Kyler told her that he was afraid Rob would kill him. The maternal grandmother similarly reported that Kyler was "scared to death" of Rob. Kyler was given an assignment to "write about a day that changed your life." Kyler wrote about the day he was removed from Krista's custody and taken to Polinsky Children's Center and then to his grandparents' home. Regarding being at his grandparents home, he wrote "I feel really safe there, no karate, no wrestling, no nothing like that. I live there now and I'm so glad I live there."

The Agency reported that Krista continued "to deny that the incidents that led to the removal of the children occurred, and reports that this has been a misunderstanding and her children need to be returned." Krista told the social worker, "[W]hat you're allowing [the maternal grandmother] to do is criminal[;] she is putting things in [the children's] heads and using them as pawns[.] . . . [It's] very concerning that only with my mom they say bad things because there's no case here." The Agency expressed "great concern for the safety of the children" because Rob was still involved with Krista and Kyler continued to express fear of him.

Contested jurisdiction/disposition hearing

The court held a contested jurisdiction and disposition hearing on November 21, 2014. The court received in evidence the Agency's reports and the social worker's

10

curriculum vitae. The court heard testimony from Krista, Rob, Rob's mother, the social worker, and several other witnesses.

Krista testified that Kyler's and L.L.'s allegations of Rob's abusive behavior were not true. She also regarded as untrue a report by a court-appointed special advocate in the previous dependency case that Rob had been "rough housing" with the children. She testified that Rob had no contact with the children the weekend that Kyler claimed he was choked with the dog collar, and that the dog collar incident occurred on Saturday, May 10, 2014, when she and Kyler and L.L. were in the living room and the boys were playing with the collar and a leash. Because she was packing boxes on the other side of the kitchen bar, she did not see what Kyler and L.L. were doing but she heard Kyler cry and then rushed over to him and saw a "hairline scratch on his neck."

Rob testified that he lived with his mother and brother and was not at Krista's house at any time on May 10. He stated that he underwent a knee surgery procedure on May 9 and was "home all day" on May 10 except for going with his mother to a swap meet in the morning and to a Walmart later in the day. He testified that he was at the swap meet for about 45 minutes and was gone about an hour when he and his mother went to Walmart. He denied that he ever wrestled with or put a dog collar on any of the children or that he performed karate moves on Kyler.

Rob's mother, Mary B., testified that on May 10, she and Rob went to the swap meet and that Rob was home "all day" after the swap meet. They were at the swap meet from around 10:00 a.m. to about 3:30 p.m. Although the social worker's written report stated that Mary said she and Rob went to a Walmart store for a couple hours on May 10,

11

Mary testified in court that she shopped on the Walmart Web site that day and did not go to the Walmart store, and she denied telling the social worker that she went to the store. The social worker had also reported that when she interviewed Mary, Mary stated Rob was not at the house after 5:00 p.m. on May 10. However, Mary testified in court that she did not recall saying that to the social worker, and that she told the social worker Rob "was upstairs on the 10th."

The social worker testified that she interviewed Kyler and L.L. about six times and watched a video of Kyler's forensic interview. Kyler appeared to be able to distinguish between the truth and a lie. In the social worker's professional opinion, the children were at risk of substantial physical harm under section 300, subdivisions (b) and (j) based on Kyler's neck injury and the statements of Kyler and L.L. in the Agency and forensic interviews.

After hearing argument of counsel, the court made true findings on the children's petitions by clear and convincing evidence and declared the children dependents of the court. The court removed them from Krista's custody, finding by clear and convincing evidence that removal was appropriate under section 361, subdivision (c)(1). The court directed the Agency to provide Krista reunification services.

## DISCUSSION

Krista contends the evidence was insufficient to support the disposition orders removing the children from her custody. We disagree.

To remove the children from Krista's parental custody, the Agency was required to prove by clear and convincing evidence that "[t]here is or would be a substantial danger

12

to [their] physical health, safety, protection, or physical or emotional well-being [if they] were returned home" and that removal was the only reasonable means of protecting their physical health (§ 361, subd. (c)(1)). Thus, "[a] removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) The court may consider a parent's past conduct as well as present circumstances to gauge whether the parent has progressed sufficiently to eliminate any risk. (*In re A.S.* (2011) 202 Cal.App.4th 237, 247; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.) On appeal, Krista has the burden of showing that there is no substantial evidence justifying removal. (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1135; *In re Geoffrey G*. (1979) 98 Cal.App.3d 412, 420.)

We conclude that the evidence sufficiently supports the court's decision to remove the children from Krista's custody. In its oral ruling, the court stated that its finding that removal was appropriate was based on documentary evidence as well as the testimony. The court cited the Agency's detention report as the "key piece of documentary evidence." The court noted that the photographs attached to the report showing Kyler's neck injury and the dog collar in question corroborated Kyler's statements that "he was, in fact, choked with what appears to be a dog collar." Based on the photographs, the court found that "the physical injuries that Kyler sustained are clearly a direct result of abuse." The court noted, "[T]here appear to be several lacerations or scratches that . . . break

13

through the skin that appear consistent with the collar that is shown on the top of the two photographs. Clearly looks like there was a potential struggle, as there's red marks on Kyler's chest that are exposed by his T-shirt [and] red marks throughout his neck area at three separate places."

Turning to the question of "who committed this offense against Kyler," [t]he court noted that Kyler told both his teacher at school, where the photographs were taken, and the social worker that Rob had choked him with the collar. The court noted that L.L. corroborated Kyler's statements.[8] The court found Kyler's and L.L.'s statements credible and did not find Rob's testimony credible. The court noted that "[t]he differing version[s] of where [Rob] was on the 9th and 10th [of May], for how long and with whom, lead the court to see [Rob's] credibility in this case as suspect." The court found that Kyler's and L.L.'s statements alone constituted clear and convincing evidence of the truth of the allegations in the petitions. The court was entitled to find Kyler and L.L. credible and disbelieve Rob's and Krista's conflicting testimony.[9] (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [assessing credibility and resolving conflicts in the evidence are the domain of the trial court, not the reviewing court, and evidence from a single witness may be sufficient to support the trial court's findings].)

---

8    The court presumably was referring to L.L.'s corroboration of Kyler's statements about Rob's performing karate moves on Kyler. L.L. did not corroborate Kyler's statements about the dog collar incident.

9    The court did not make an express finding on Krista's credibility. However, in making true findings on the petitions and finding that Kyler's and L.L.'s statements about Rob's abuse of Kyler were credible, the court impliedly and necessarily found that Krista's conflicting testimony regarding those statements was not credible.

14

The court based its finding that Kyler was credible in large part on a photograph (attached to the detention report) of Kyler demonstrating the position he was in when Rob "hog[-]tied" him. The court noted: "Now, Kyler is blind. And he does not have the ability to see, so we can't say that this is something that Kyler's seen on TV or that this is something that he's seen [done] to another person. When I see the photograph . . . it appears to me to be a child who is showing what was done to him. [¶] Once again, he doesn't have eyesight to make up this type of abuse. In fact, he is showing what happened to him and, clearly, is on the floor and appears to be in a position where he's hog[-]tied . . . ." The court reasonably viewed the photograph of Kyler's "hog[-]tie" demonstration as evidence supporting Kyler's allegation that Rob performed karate and wrestling moves on him. The photograph and Kyler's and L.L.'s statements constitute substantial evidence supporting the court's finding that the allegations of the children's petitions were true.

Regarding the dispositional order removing the children from Krista's custody, we conclude that the record supports the court's finding Krista was unable to provide proper care for the children and they would be at risk of harm if they remained in her custody. The court reasonably found that Krista "failed to protect . . . . And by failing to protect, [Krista] is equally culpable of the allegations in the petition[s]." Krista steadfastly and adamantly denied that Rob had committed any of the acts alleged in the dependency petitions, and she repeatedly attempted to manipulate Kyler into retracting his allegations against Rob and making statements that he clearly viewed as false. For example, immediately after a conversation in which Krista asserted to Kyler that Rob had merely

15

*talked* about wrestling and had never actually wrestled with Kyler, Kyler became terrified because, in his words, his mother "said that Rob was just TALKING about wrestling and he wasn't. He was trying to do [karate] on me." Kyler told the forensic interviewer that Krista got mad at him for "opening a court case," and that Rob and Krista told him "if you say Rob did this or mom did this, they're taking you away to a place and it's not gonna be good." Regarding his current placement with the maternal grandmother, Kyler wrote, "I feel really safe there, no karate, no wrestling, no nothing like that. I live there now and I'm so glad I live there."

Krista's persistent denial of Kyler's and L.L.'s allegations of Rob's abusive conduct and her efforts to persuade Kyler to retract his allegations in the interest of preserving her relationship with Rob reasonably support a finding that Krista was putting her relationship with Rob above the safety and protection of the children. As noted, the focus of section 361, subdivision (c)(1) is averting harm to a dependent child. Given the evidence of Rob's abuse of Kyler and the other children, Kyler's fear of further abuse by Rob, Krista's knowledge of the abuse and failure to intervene to protect Kyler, and her commitment to Rob's being a part of the children's lives despite his abusive conduct, the court could reasonably find by clear and convincing evidence that there would be a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if they were returned to Krista's custody and that removal was the only reasonable means of protecting them. (*Ibid.*) Substantial evidence supports the court's decision to remove the children from Krista's custody.

16

DISPOSITION

The judgments are affirmed.

HALLER, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.